**PORTER, Adm'r, OPA, v. SCHROER.**

No. 5347.

District Court, N. D. Ohio, W. D.

April 4, 1946.

A. D. Ruegsegger, Regional Enforcement Atty., O. P. A. of Cleveland, Ohio, Alvin N. Haulund, Acting Chief Enforcement Atty., of Maumee, Ohio, and Edwin J. Lynch, Enforcement Atty., of Toledo, Ohio, for plaintiff.

Otto W. Hess and George A. Meekison, both of Napoleon, Ohio, for defendant.

KLOEB, District Judge.

This is a suit by Paul A. Porter, Administrator of the Office of Price Administration, in which the defendant is charged with having sold and delivered popcorn to persons other than the ultimate consumers at prices in excess of the maximum prices therefor established by Maximum Price Regulation No. 502. The complaint alleges

that the prices received by the defendant exceeded the maximum prices by $11,258.-21 and prays for triple damages of $33,774.-63 and an injunction. The answer of the defendant is a general denial. Trial was had to the Court.

Since 1936, the defendant has been employed by the Confection Cabinet Corporation of Chicago, Ill. His duties consisted of locating farmers who would agree to plant certain of their acreage in popcorn. A written contract was entered into between such farmers and the Confection Cabinet Corporation whereby the farmer or grower agreed to plant a number of acres in popcorn, to pick same at maturity, and to deliver it to the Confection Cabinet Corporation at the grower's farm. These contracts were signed by the farmer for himself and by the defendant or one of his employees for the Confection Cabinet Corporation. After arranging the contracts, the defendant delivered seed popcorn to the farmers, inspected the land on which it was to be planted for proper preparation, and thereafter inspected the plot to see that cultivation was being carried on properly and to determine when the popcorn should be picked. When it was picked he arranged to have it weighed, hired trucks to haul it to cribs, after having employed help to prepare the cribs and to assist in unloading and placing the popcorn in the cribs. In addition, he furnished a certain number of cribs for the storage of the popcorn on the farm which he has rented since 1923 and where he makes his home. For this work the defendant was paid $5 per ton for all popcorn delivered to the cribs. He employed others to assist him, not only in the operation of cribbing the popcorn, but also in securing contracts with farmers and in inspecting the land, cultivation and crop. The cost of all this help was paid for by him out of the $5 per ton. The only expense incurred not paid for by him out of the $5 per ton was for trucking charges. For all of the popcorn thus handled every grower was paid the maximum price established by Maximum Price Regulation No. 502. Payment was made by the defendant's personal check out of money advanced to him by the Confection Cabinet Corporation for that purpose.

The defendant grew no popcorn himself during the period covered by the complaint. Neither did he buy any popcorn in his own name for sale to the Confection Cabinet Corporation. It is the facts outlined above that plaintiff contends must be construed to amount to a sale by defendant to the Confection Cabinet Corporation under Maximum Price Regulation No. 502.

Certainly, it would be a strained construction to hold that, under these circumstances, there was a sale by the defendant in the ordinary use of the term. Plaintiff points out, however, section 7 of Maximum Price Regulation No. 502, contending that defendant was a broker, and that under this section the $5 per ton paid defendant by the Confection Cabinet Corporation, plus the amount paid to the growers, resulted in a $5 overcharge for each ton of popcorn purchased by the Confection Cabinet Corporation.

Section 7 of the Regulation provided as follows: "In accordance with existing trade custom, every broker taking part in a sale shall be considered as the agent of the seller and not the agent of the buyer. In any case, the amount paid by the buyer to the broker plus the amount paid by the buyer to the seller shall not exceed the seller's maximum price plus allowable transportation actually paid by the seller or by the broker. The term 'broker' includes a 'finder'."

Effective December 28, 1944, section 7 was amended to read as follows:

"(a) In accordance with existing trade customs, the broker taking part in a sale shall be considered as the agent of the seller and not the agent of the buyer. In any case, the amount paid by the buyer to the broker plus the amount paid by the buyer to the seller shall not exceed the seller's maximum price plus allowable transportation actually paid by the seller or by the broker. The term 'broker' does not include a field agent."

"(b) Any field agent or field representative performing the functions of contracting popcorn acreage and servicing, buying, receiving and shipping the unshelled or shelled popcorn for the account of a processor will be considered the agent of the processor. The maximum price which may be paid to a field agent for such services shall not exceed 25¢ for each 100 pounds of unshelled or shelled popcorn delivered."

It can hardly be gainsaid that the activities of the defendant fall within the definition of a field agent as set up in the amended regulation. That this is conceded even by the plaintiff appears from the following: The complaint charges sales up to

and including February 15, 1945, but in plaintiff's trial brief this statement is made: "There are certain dates set forth in his books which are after December 28, 1944; but Plaintiff will show that these were payments on contracts for the sale of popcorn prior to December 28, 1944, which is the date of Amendment No. 2." The question, then, is whether or not before the amendment the term "broker" included a field agent. In other words, was the defendant in his activities prior to December 28, 1944, acting as a broker? If he was, there was a violation of Maximum Price Regulation No. 502.

▪ Nowhere in the Regulation in question, or in the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix § 901 et seq., is any definition given of the term "broker". The Court must conclude, therefore, that the term was intended to bear the usual and ordinary meaning which the law has always given it.

▪ A broker is a special type of agent known to the law for centuries and the relationship has certain definite characteristics. In Domat's Civil Law the office and duty of a broker is stated as follows: "1204. The Office of a Broker. The engagement of a broker is like to that of a proxy, a factor, or other agent; but with this difference: that the broker, being employed by persons who have opposite interests to manage, he is, as it were, agent both for the one and the other, to negotiate the commerce and affair in which he concerns himself. Thus his engagement is twofold, and consists in being faithful to all the parties in the execution of what every one of them intrusts him with. And his power is not to treat, but to explain the intentions of both parties, and to negotiate in such a manner as to put those who employ him in a condition to treat together personally." Bk. 1, part 1, tit. 17, art. 1.

In Story on Agency, § 28, it is said: "The true definition of a broker seems to be that he is an agent, employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation, for a compensation, commonly called 'brokerage.' * * * Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him. Where he is employed to buy or sell goods, he is not intrusted with the custody or possession of them, and is not authorized to buy or sell them in his own name. He is strictly, therefore, a middle man, or intermediate negotiator between the parties."

In Haas v. Ruston, 14 Ind.App. 8, 42 N.E. 298, 301, 56 Am.St.Rep. 288, the Court said: "A broker is a peculiar kind of an agent, and brokerage is a peculiar kind of agency. It is the business of a broker to negotiate contracts between others in matters of trade and commerce. He usually deals with the contracting parties, and not with the things which may be the subject of the contract. He has neither interest in nor possession of the property which it is his business to buy or sell for others, * * *"

In French v. City of Toledo, 81 Ohio St. 160, 167, 90 N.E. 160, 161, 25 L.R.A., N.S., 748, the Court quoted with approval the following definitions of a broker: " 'A broker is an agent employed to effect bargains and contracts as a middleman between other persons for a compensation called brokerage. He takes no possession, as broker, of the subject-matter of the negotiations.' Webster's International Dictionary. 'Brokers are those who are engaged for others in the negotiations of contracts relating to property with the custody of which they have no concern.' Bouvier's Law Dictionary [Rawle's 3rd Rev.] City of Portland v. O'Neill, 1 Or. 218."

In 6 O. J. § 3, p. 172, in speaking of the distinction between brokers and factors, it is stated: "As above stated, the sole function of a broker is the negotiation of transactions in behalf of others; he deals merely with the contracting parties, rather than with the property to which the contract relates; a factor, on the other hand, deals not only with the parties, but with the subject-matter of the contract as well; consequently, he is given actual or constructive possession of his principal's goods, and frequently has a special property in, and a lien upon, the goods bought or sold, for his charges, advances, or commissions."

In 12 C.J.S., Brokers, § 3, p. 8, in distinguishing between brokers and other agents generally, it is said: "A broker is distinguished from an agent, in that a broker holds himself out for employment by others, and acts as an intermediate negotiator between the parties to a transaction, and in a sense is the agent of both parties, whereas the element of exclu-

siveness of representation of the principal by which he is employed enters into the employment of an agent."

 A comparison of the facts in this case with the characteristic facts defining and delimiting the office and duties of a broker in legal contemplation convinces me that the defendant was not acting as a broker in the transactions which formed the basis of the complaint. Some of the significant differences, among others, between defendant's activities and duties and those of a broker stand out boldly. First, many of the defendant's activities and duties had to do with the custody and possession of the property involved. Secondly, the defendant did not hold himself out for employment by others, but on the contrary was employed by the Confection Cabinet Corporation. Again, the activities and duties of the defendant comprised a great deal more than merely acting as a middle man between the parties.

While not perhaps strictly in point in determining the legal meaning to be attached to the term "broker" as used in the Regulation, it might be well to point out also a recognized business definition of the term. In Manual of Retail Terms, Wingate, Prentice-Hall 1931, at page 9, it is said: "Broker. A person who brings about the sale of goods without owning them or having them in his possession. He may represent either the seller or the buyer. He does business in the name of his principal rather than in his own. While, strictly, his work has to do with negotiating a sale and not with the handling of the goods themselves, in practice the broker may furnish his principal with information as to market conditions and may collect payment and advance funds. He often arranges for pool car shipments, attending to the division of a carload among various buyers when it arrives. *When assuming such broad functions, this individual is acting as a selling or a buying agent rather than as a broker, in a strict sense.*" (Emphasis supplied.)

I am convinced that a construction of the term "broker" as used in the Regulation to include the occupation and activities of the defendant would be at variance with every legal definition of the term from the earliest common law reports of the King's Bench to the latest reports of our own Courts.

The complaint of the plaintiff will be dismissed.

Defendant may have ten days in which to prepare findings of fact and conclusions of law in accordance with this memorandum, and the plaintiff may have five days thereafter in which to file any objections or suggested additions thereto.